**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO.   08-81447- CIV-HURLEY**

**PHILIP DAVIS, as Personal Representative of**
**THE ESTATE of  BRIAN DAVIS,**
    **Plaintiff,**

**vs.**

**UNITED STATES OF AMERICA,**
    **Defendant.**
_____/

**MEMORANDUM OPINION**

Plaintiff Philip Davis, as personal representative of the Estate of Brian Davis,  brings this wrongful death action under the  Federal Tort Claims Act, 28   U. S. C. § 2671 *et seq*.  against the United States of America.  Plaintiff's complaint alleges negligence against  Mark Best, a United States Customs and Border Protection Officer involved in a rear end automobile collision with plaintiff's decedent,  Brian Davis, on Interstate 95 in Lake Worth, Florida on January 8, 2008. Plaintiff Philip Davis, the sole surviving parent of Brian Davis, brings claim for emotional pain and suffering sustained as a result of the death of his son.

The United States of America has  filed  its answer and affirmative defenses to plaintiff's complaint asserting, *inter alia*, the doctrine of comparative fault.  In addition, the United States contends that the negligence of  third party *"Fabre"* defendants contributed to causing the  accident and that the  court should allocate the proportionate degrees of fault attributable to each tortfeasor

1

accordingly.[1]

On May 10, 2010 through May 19, 2010,  the case was tried before the court without a jury. Having fully considered the evidence presented at trial  and arguments of the parties, the court  now enters its findings of fact and conclusions of law pursuant to Fed. R. Civ. P. 52.

## I. Findings of Fact[2]

## A. Family History

Brian Davis was born on April 17,  1990 and died on January 8, 2008 at the age of seventeen. He was born in Sacramento, California, where he resided with his father, mother and brother Jeremy until the sudden death of his mother, Monique, from an asthma attack in August, 1997.  Shortly prior to her death, Monique Davis had filed for divorce and Philip Davis had moved out of the home. Brian was seven years old at the time and his brother Jeremy was ten.

While Philip  Davis describes the family's early California years as a golden time during which he taught his boys to swim, ride bikes and horses; pulled the children on tractor rides with

---

[1]

A *Fabre* defendant is a nonparty defendant whom a party defendant asserts is wholly or partially responsible for the negligence alleged. *See Salazar v Helicopter Structural & Maintenance, Inc.,* 986 So.2d 620 (Fla. 2d DCA 2007).

In this case, the United States identifies as *Fabre* defendants Astaldi Construction, Corradino Group and the Florida Department of Transportation, all of which had some involvement in the highway construction project where the accident occurred. These actors were originally named as party defendants, but plaintiff has since filed notice of dismissal of all claims against them based on settlement.

Where fault is allocated among nonparty tortfeasors pursuant to *Fabre*, the non-settling defendant is  liable in damages only  for the  proportionate  percentage of fault assigned to it. *See Fabre v. Marin*, 623 So. 2d 1182 (Fla. 1993).

[2]

Except where otherwise noted, the court's findings of fact are drawn from: (1) the testimony of Carrie Bogue, which the court has fully credited as reliable and trustworthy;  (2) the police and hospital records in evidence; (3) the statements and admissions of plaintiff Philip Davis and (4) the testimony of Katie Pelligrino, which the court finds credible and worthy of belief.

neighborhood friends, and gave the boys a puppy to teach them responsibility, the court is skeptical of this rosy picture painted by Mr. Davis, finding it wholly at odds with the history of crippling drug abuse relayed by Mr. Davis to treating medical personnel during a May 1998 admission at a Florida Veterans Administration Hospital, where he reported that he typically spent $3000 a month on crystal meth while living in California, using it on a daily basis, 30 times a month, as well as $750 a month for alcohol and $80 a month for marijuana. On cross-examination during the trial, Philip Davis himself admitted that he used methamphetamine when Brian was a child, and that his wife, Monique, wanted a divorce because of his alcohol and drug abuse.

After his wife died, Philip Davis conducted a large yard sale with his two young sons in attendance and sold all of the family's possessions. From there, with the assistance of his sister, Carrie Bogue ("Aunt Carrie"), in the fall of 1997 he moved the family to Indiana for a short time, and then relocated to Palm Beach County, Florida, where Aunt Carrie had rented a home for them about three miles away from her own house. Within three to four weeks, Philip Davis met a woman, Debbie Brooks, and moved into her home in Jupiter Farms together with the two boys. The boys took along their new pet pug dog, "Monique," which Aunt Carrie had purchased for them at the suggestion of a psychologist. The dog soon disappeared, and, according to Aunt Carrie, Philip Davis "bragged" to her that he had drowned it. The court finds this testimony of Aunt Carrie credible and worthy of belief. There was no testimony elicited from Mr. Davis regarding the dog's disappearance. Brian's brother, Jeremy, testified on rebuttal that his father told the boys the dog had run away, posted "lost dog" signs throughout the neighborhood, and took the boys out searching for the dog for over a week.

Philip Davis and Debbie Brooks soon became embroiled in domestic disputes, and, two or three months later -- after a 911 call to the police which culminated with Mr. Davis' arrest for assault on a police officer -- Ms. Brooks obtained a restraining order against Mr. Davis and evicted him. The boys were present during the altercation that led to the arrest, and ran to a neighbor's house to call Aunt Carrie for assistance.

With Philip Davis in jail, Aunt Carrie "had to get the boys off the street," and took them into her home in Palm Beach Country Estates, Palm Beach Gardens. When Mr. Davis was released from jail a few days later, he too moved in with his sister Carrie for two or three months.

To help the boys process their grief over losing their mother, Aunt Carrie arranged for counseling, which she herself attended together with the boys and her husband John for a couple of years. Although she told Philip Davis about the counseling, he attended only a single session.

After a few months Philip Davis found work as a car salesman and moved out into his own apartment. He left the boys in the home of Aunt Carrie, and for the next three years, Aunt Carrie and her husband John raised them as their own sons, with the boys looking to them as mother and father. In April, 1998, Philip Davis provided his sister with an initial formal power of attorney over the boys, vesting her with complete authority and discretion to manage all matters affecting their health, education and welfare. He signed another general power of attorney in November 1999, this time extending Aunt Carrier's complete authority over the welfare of the boys up through the year 2011. With Philip Davis' permission, the Bogues claimed their nephews as dependents on their tax returns for the three consecutive years during which they lived under her roof.

During Brian's elementary and middle school years, Aunt Carrie and Uncle John met with school administrators every two to three months for planning and updates on Brian's progress in the

4

a learning disability program, known as the "ESE" program, administered by the School District of Palm Beach County. They arranged for removal of his tonsils and adenoids in order to correct a hearing problem diagnosed in elementary school. They also tutored Brian extensively at home, with Aunt Carrie at one stage sitting down every night to read Harry Potter books with Brian, each taking turns reading one page to the other.

While the children lived with Aunt Carrie, Philip Davis visited his children on average of one day a week, often inebriated. On more than one occasion, Aunt Carrie and Uncle John had to physically "pull him off the kids because he was taking a belt to them and beating them." Aunt Carrie testified that these episodes "happened when he was drinking, but he was drinking more often than not." On another occasion, Philip Davis called his sister from the road threatening to kill himself in a car crash on I-95, where he was reportedly traveling at 95 to 110 mph, leading Aunt Carrie to call the Florida Highway Patrol and initiate Baker Act proceedings.[3]

As further established in the testimony of Aunt Carrie, which the court fully credits as trustworthy and reliable, at some point in early 2000, the Social Security Administration (SSA) discovered that Philip Davis had been collecting a total of roughly $1200 per month in death benefits on behalf of his two sons while the boys no longer lived with him and were claimed as dependents on the Bogues' tax returns. At the SSA's request, Aunt Carrie created spread sheets indicating that Philip Davis had given her only $200 to $300 for support of the children over the

---

[3]

Under the Florida "Baker Act," mentally ill individuals may be subject to involuntary civil commitment at a mental health facility at the behest of a police officer or other interested person for limited periods of evaluation in cases where the person is substantially likely to inflict serious bodily harm to self or others if released. § 394.467, Fla. Stat. (2007).

entire term of her custody, leading the SSA to demand reimbursement of approximately $27,000.00 in misappropriated benefits from Philip Davis and to threaten termination of benefits unless administration of the funds was turned over to the Bogues, the boys' true custodians. In order to avoid termination of benefits, Philip Davis decided to take custody of the boys himself, and agreed to allow the Bogues to act as fund administrators. The court finds Aunt Carrie's testimony regarding this SSA investigation, including her description of Philip Davis' reaction to it, to be credible and worthy of belief.

Philip Davis testified that he moved the boys back in with him in April 2000. However, the court rejects this testimony as incredible and unworthy of belief. Aunt Carrie testified that she had the boys under her roof for over three years; since she took them in immediately after her brother's arrest and eviction from Debbie Brooks' home in approximately April of 1998[4], she necessarily had the boys in her care until at least the early part of 2001. This is consistent with school records admitted in evidence, showing that Aunt Carrie and Uncle John signed a "Student Emergency Health and Safety Information" form dated August 18, 2000 on behalf of Brian, then entering 5th Grade at Lighthouse Elementary School, reciting that Brian lived with his aunt and uncle because his mother was deceased and his father, who was "in town," had granted the aunt and uncle a complete power of attorney. [Notably, the substitute emergency contact number provided on this school form is Chris DeSouza, identified as friend of the family].

---

[4] Psycho Social Assessment records from "CARP," an alcohol rehabilitation program which Philip Davis was court ordered to attend after the Debbie Brooks' episode, shows that he presented to CARP on May 1, 1998. The assessor's notes reference a hearing set May 4, 1998 in connection with his girlfriend (Debbie Brooks)'s application for a restraining order against him.

Thus, sometime in early 2001, after the SSA investigation revealed the discrepancy in payments between Philip Davis and the boys' true custodians, Carrie and John Bogue, Philip Davis moved his sons into his two-bedroom house on Celery Street in the "Gardens of Woodberry" development in Palm Beach Gardens, a home at which Philip Davis himself had resided since September 1999,[5] and where he by then was living with his new wife, Winifred Pearl, along with her two teenage daughters, Melissa and Denise. [As relayed in testimony of Philip Davis, Philip and Winifred Pearl met in February, 2000, moved in together at his Celery Street house in April, 2000 and married in September 2000.]

Philip Davis housed the boys in a single bedroom which they were required to share with Winifred's two teenage daughters. Denise eventually moved out to attend college. Jeremy ran away when he was 15, initially to the home of the Caspars, old neighbors from Aunt Carrie's Palm Beach County Estates neighborhood, and then to the home of his Aunt Carrie, who had moved to Naples. He moved again with Aunt Carrie and Uncle John to Port Orange in May, 2003, and continued to live with them until Uncle John died in 2004. Then age 17, Jeremy returned to Palm Beach Gardens where he was again invited to stay with old neighbors in Palm Beach Country Estates until he finished high school.

---

[5] Aunt Carrie purchased this home in September, 1999 for her brother with life insurance money from a policy insuring Monique Davis after successfully negotiating with the insurance company for reinstatement of the policy after it had been allowed to lapse. Aunt Carrie testified that she collected roughly $80,000 to $100,000 in death benefits, part of which was applied as a down payment on the Celery Street home, with the rest invested to provide college funding for the boys. When Philip Davis persistently protested her control of the investments, she ultimately relinquished authority over the invested monies to her brother and the funds were soon dissipated.

Brian and Melissa continued to share a room at the Celery Street address after their elder siblings departed. Brian immersed himself in schoolwork, competitive swimming, community service, and nearly full time employment at a local restaurant. His outstanding contributions to the community resulted in a prestigious "Pathfinders Award" from his high school. He took several rigorous Advanced Placement (college level) courses, and single-handedly oversaw development of his academic planning with high school advisors. He was captain of the Palm Beach Gardens High School swim team for three years, voluntarily forfeiting his title during his senior year in a generous gesture designed to give other students an opportunity to serve. He was popular with a closely knit circle of friends in the neighborhood, frequently offering his time to help friends with homework projects.

Although Brian physically lived apart from his Aunt Carrie during this period, he continued to maintain a very close relationship with her, calling at least once a day to let her know he was safe and well. When he reported that he had taken to sleeping in his 1992 Toyota Camry (purchased by Aunt Carrie as a Christmas gift) when his father was drunk, Aunt Carrie offered to rent an apartment for him while he finished his last two years of high school. When he reported that he was going hungry, she purchased a "teen" cash card for him so he could buy his own food, and as he reported his expenditures by email, she would periodically refurbish the funds. The court finds Aunt Carrie's testimony regarding these developments to be credible and worthy of belief.

Brian regularly consulted Aunt Carrie by phone and email for advice on homework assignments, college preparation and advice in completing his Pathfinder Award application. Although he formally resided at his father's Celery Street address, he moved into Aunt Carrie's Palm Beach Country Estates home every other weekend when she still lived in Palm Beach Gardens,

8

and when she moved to Naples he visited her home  at least one weekend every month  (traveling by train initially, and later  by car)  during the school year, and stayed with her for the entirety of every  school vacation –  spring break,  summer vacation,  Thanksgiving and  Christmas.

In her established  role as mother figure,  Aunt Carrie continued to communicate  with Brian's  high school teachers, swim coach, and guidance counselors;  took Brian on   family vacations, including  trips  to the Grand Canyon, Colorado River  and  Dominican Republic during the summer of his junior year, and provided  constant  emotional and financial support, paying from her own pocket for Brian's food and  clothing.  School administrators treated her as Brian's mother, and, after Brian's tragic death,  invited  her to accept a posthumous graduation degree on Brian's behalf, sending her  two front row tickets for the ceremony.

While Brian Davis managed to find his way in this world under Aunt Carrie's supportive guidance and oversight,  the Davis household on Celery Street heaved in constant  turmoil with alcoholic outbursts from Philip Davis.  Aunt Carrie testified that she received  reports  of upsets on nearly  a weekly basis,  recalling one instance where an enraged Philip broke a coffee table in half with his hands,  and another where he punched a hole through a wall with his fist. These outbursts precipitated  several  Baker Act admissions and at least ten  police  emergency calls to the Davis home  between June 2004 and January 2007.  Highlights from the corresponding police reports and Veterans Administration (VA) hospital records  include:

June 2004:    Brian calls 911 reporting dad  lying on floor; police transfer Philip to VA where
                       Philip tells intake personnel  he has been drinking ½ of a  1.72 liter bottle of vodka
                       a day since age 22-23; Blood alcohol registers at .356; Patient reports history of
                       alcohol dependence,  amphetamine dependence, and cannibis abuse.

Sept.  2004:   Winnie calls 911; Phil is  punching walls, holding hand to  head in mock
                        firearm gesture; Police initiate  Baker Act procedures and transfer to  VA

Oct. 2004: Phil calls 911; reports taking 50 blood pressure pills; on arrival medics report blood pressure as normal, take patient to 45th St., Columbia Mental Health Facility for evaluation

Feb. 2005: Winnie calls 911; reports Philip is intoxicated, screaming, hitting his head on wall; Police initiate Baker Act procedures and transfer to VA

Mar 2005: Winnie calls 911; Medics find Phil with mouthful of 20 antacid pills; Initiate transfer to VA hospital where blood alcohol registers at .353

Nov. 2005 Melissa calls 911 reporting physical fight between intoxicated Phil and Winnie; Winnie arrested on domestic violence charges [In trial testimony, Philip recalls Winnie "taking a knife" to him]

Feb. 2006 Jeremy calls 911, reports dad drinking, threatening to drink bleach, throwing things in the home.

Dec. 2006 Winnie calls 911, Phil breaking and throwing things in home; After medics get him off floor, Phil becomes agitated and grabs bottle of pills; Philip is handcuffed and transferred to VA on Baker Act admission;

In 2007, as a result of a probation violation, Philip was ordered to attend an in-patient residential ninety- day inpatient alcohol treatment program in a nearby residential facility known as "CARP" ("Comprehensive Alcoholism Rehabilitation Program") which he completed during the months of April, May and June, 2007. Although Brian was then seventeen years old and owned his own car, the uncontroverted evidence shows that he never once visited his father during this ninety-day CARP confinement.

These records belie Mr. Davis' claim, proffered during trial testimony, that his problems with alcohol abuse began after the death of his first wife Monique in 1997, and were exacerbated by gastric by-pass surgery in 2002 (for weight management). Philip Davis himself gave contrary information to admitting medical personnel during his July 2004, VA admission, when he reported

that his alcohol consumption began at age 15 years, and by age 16 he was drinking heavily (five or more drinks at least twice a week). Moreover, in these same medical notes, the attending physician notes that Philip Davis had earlier acknowledged a history of amphetamine abuse during patient interviews in several VA admissions in 1998, while he denied it on this occasion, stating that he "made up the whole story to help his son," allegedly because the child's psychiatrist advised it so the son would not think his dead mother was a liar, a story Philip Davis apparently felt compelled to stick with in order "to be consistent."

Notably, the medical history evidence does not reveal any acknowledgment by Mr. Davis of the severity of the impact of his alcoholism on his family, or any corresponding voluntary efforts at rehabilitation on his part prior to the death of Brian in January 2008.[6] Instead, in a June 13, 2004 progress note, Philip Davis reported to attending medical personnel that he did not believe his drinking or behavior had any adverse effect on his children. In the "plan" section of this report, the therapist finds that the patient meets the criteria for enrollment into the Substance Abuse Outpatient Program, but notes he "is reluctant to be scheduled for any groups at all because of the uncertainty of his work schedule." Similarly, several months later, during his September, 2004 VA admission, an outpatient substance abuse program is again recommended, but Philip Davis stated "he did not require assistance as he will be returning to his previous residence," and in discharge note from that same admission, the attending physician records that the "patient does not want to be detoxed" and

---

[6]

While Philip Davis testified to participation in two rehabilitation programs through "CARP," both were court ordered as a term of probation in criminal matters (the first in 1998 following his arrest for assault on a police officer at Debbie Brooks' home, the second in 2007 following a disorderly arrest at the VA Hospital).

"reports minimal to no withdrawal symptoms."

The police and hospital records also belie Philip Davis' effort to portray his alcohol problem as a "family crisis" which served to "pull the family together," or Winifred Pearl's description of Philip Davis as a "quiet drunk" who usually slept it off in the corner. This evidence shows plaintiff's alcoholism manifesting in multiple, violent chaotic episodes which had an enormously disruptive impact on the family members around him, leaving a self-preoccupied Philip Davis largely unaware and uninvolved in the activities, achievements and life of his extraordinary son.

This detachment is evinced in Philip Davis' own deposition testimony, where he was unable to recall the name of a single teenage friend, teacher, guidance counselor or coach involved with his child. At trial Philip Davis also conceded he was unaware that his son had traveled with Aunt Carrie to the Grand Canyon or Dominican Republic in the summer of 2007.

Mr. Davis claims to have attended "99.9 percent" of Brian's high school swim meets. The court rejects this testimony as unworthy of belief, noting that neither of Brian's attending classmates, Katie Pelligrino or Lauren Federico, ever saw him at one. Similarly, while Mr. Davis claims to have enjoyed once a week "bowling nights" and "movie and popcorn nights" with his son and classmates all gathered into the fold at his Celery Street house, this bucolic picture of family life in the Davis home is belied by testimony of Brian's neighborhood girlfriend, Katie Pelligrino, who testified she was Brian's "best friend" during the two years prior to his death, eventually engaged in a romantic relationship up through some point in the summer of 2007.

Ms. Pelligrino testified that Brian spent the least possible amount of time in the Celery Street house to avoid his father, instead absorbing himself with school, work, athletics and assisting his friends, all while running a "countdown" to graduation day because "he could not wait to get away

12

from here, and once he did, he wouldn't come back." She said Brian shielded her from the Davis household, told her that he hated his father, always referred to him as "Phil" because he did not see him as a dad, and was embarrassed by the fact that his middle name was "Philip" because he disliked the association. Katie Pelligrino testified that she attended every swim meet during Brian's junior year, and never saw Philip Davis in attendance. The court finds the testimony of Katie Pelligrino in each of these aspects credible and worthy of belief.

The court recognizes that the testimony of classmate Lauren Federico creates a vastly different picture of Davis family life than that portrayed by Ms. Pelligrino, but it does not find Ms. Federico's testimony to be reliable in significant aspects. First, Ms. Federico testified that she was close with Brian in roughly the last twelve months of his life (from approximately December 2006 through the date of his death on January 8, 2008), spending an average of two to four evenings per week at the Davis home, where she routinely observed Mr. Davis return home around 5 or 6 pm, sit down for a half hour or so to exchange pleasantries with Brian, effusively compliment Brian on his daily school and athletic achievements, bake cookies, make pizza, and show constant gratitude, going so far as to even thank his son for walking the dog. She said Brian told her eight or nine before he died about his father's alcoholism, and that she had no idea before then that Philip Davis was an alcoholic.

She offered that alcoholism "actually bettered their relationship because they were able to grow stronger because of it," adding "what doesn't kill you makes you stronger,"[7] and that as Brian matured and " finally understood alcoholism is a disease," just like any other disease, he "saw how his father was trying and he saw how his father was recovering and it only made the relationship stronger." She also testified that Mr. Davis was responsible for instilling Brian's work ethic by "working his entire life to get where he is and to put food on the table," leading Brian to likewise "work for everything he had." She described Brian's stepmother, Winifred Pearl, as a "very open and loving, wonderful woman ... jolly ... caring ... always upbeat and enthusiastic," a lady who never even raised her voice.

The court cannot help but observe that Ms. Federico's description of the dynamics of alcoholism on the Davis family household tracks the notion of a "family pulled together by crisis" developed and portrayed by plaintiff throughout this trial, a characterization which the court has flatly rejected as inconsistent with the picture captured in the police and hospital records. Further, Ms. Federico's description of an ever present, cookie-baking Philip Davis is at odds with the uncontroverted evidence establishing that Philip Davis was confined in a court ordered inpatient alcohol treatment program at CARP over the entire months of April, May and June, 2007, a three month block of time covering the period of Ms. Federico's claimed intimacy with the Davis

---

[7] Although not credited by the witness, the quote "What does not kill me, makes me stronger" is generally attributed to Friedrich Nietzsche, *The Twilight of the Idols,* "Maxims and Arrows" (1888). A variation of it appears in a famous passage from Ernest Hemingway's novel, *A Farewell to Arms* (1929), Chapter 34: "The world breaks everyone and afterward many are strong at the broken places. But those that will not break it kills. It kills the very good and very gentle and the very brave impartially. If you are none of these you can be sure it will kill you too but there will be no special hurry."

household.  In like vein, while  Ms. Federico testified that  Mr. Davis " regularly" attended Brian's swim meets,  testimony elicited from her on cross-examination shows there is no foundation for this observation because the witness   herself attended only two meets, and concedes she not see Philip Davis at either one.

Recognizing that "it is the exclusive province of the judge in  non-jury trials to assess the credibility of witnesses and to assign weight to their testimony," *Hearn v McKay*, 603  F.3d 897, 904 (11th Cir. 2010), citing *Childrey v Bennett*, 997 F.2d 830, 834 (11th Cir. 1993), the court finds Ms. Pelligrino's testimony regarding the dynamics of  Davis family life more credible than that of  Ms. Federico, which the court rejects as unreliable and unworthy of belief.

In sum, while Phil Davis professes to have  harbored great love for his son, and to intensely grieve  his loss, it is particularly difficult to reconcile this testimony with the abject manner in which he   routinely   elevated his own  interests over that of his  remarkable young son, his persistent resistance to any  effort at voluntary rehabilitation despite a long history of alcohol and drug abuse dating back to the infancy of his children, and his wholesale misappropriation of the boys'  social security death benefits during the  three year period of time that the boys resided with Aunt Carrie.

## B. The Automobile Accident

On the evening of January 8, 2008, in the winter term of his senior year, Brian Davis traveled to Boynton Beach Florida to assist a classmate,  Lauren Federico,  with a school project.   At approximately 11 p.m.,  he drove  home  via Interstate 95 in  his 1992 Toyota Camry.

According to testimony of another motorist near scene of the crash, Roger Myers, which the court finds reliable and creditworthy, as Brian Davis approached the construction zone near the 6th Ave. south exit in Lake Worth he was driving in the far left northbound lane and continued in that

lane until it became necessary to slow or stop due to the traffic conditions.   Mr. Meyers initially came up from behind the Davis vehicle, passed on the right and then returned to the far left lane where he proceeded northbound until he was forced to stop.   When he stopped, he observed the Davis vehicle in his rear view mirror also coming to a stop.

At this point,  United States Customs and Border Protection Officer Mark Best, traveling home from a  temporary duty station at the Fort Lauderdale International Airport, came up directly behind Davis  in his  2004 Chevy Silverado and collided with the rear end of the Davis vehicle, propelling it into the Meyers vehicle ahead of it.  According to information retrieved from the "black box" of the Best vehicle, which the court finds credible and trustworthy, Mr. Best was traveling at a rate of 71 mph at the point of impact  and did not  decelerate before impact.

The court  finds, based on undisputed testimony, that Officer Mark Best was acting in the course and scope of his employment at the time of the subject automobile accident

The court further finds Officer Best negligent in his operation of his vehicle, in that he was inattentive to surroundings, operated  his motor vehicle at a speed in excess of the speed limit, and failed to exercise appropriate caution in the  midst of night time travel through a construction zone with lane closures.  As a result of Best's negligence, his vehicle collided with the Davis vehicle, causing massive crushing injuries to Brian Davis who  died at the scene of the accident.

Although the court heard testimony establishing  that the lane closures in the area of the accident did not meet the requirements of governing  traffic control codes adopted by the State of Florida Department of Transportation, and specifically, with regard to abbreviated length of recovery lane, the court finds, in light of the accident sequence and vehicle configuration established by testimony of  Meyers, there is no causal relationship between any irregularity with the lane tapering

or recovery zones and the collision which claimed the life of Brian Davis. The court accordingly finds that the negligence, if any, of Astaldi Construction, the Florida Department of Transportation or the Corradino Group, the nonparty "*Fabre*" defendants identified by defendant United States of America, did not contribute in any way to causing this accident. The court shall therefore not assign any allocation of fault as between these alleged third party tortfeasors.

The court finds that the conduct of Officer Best is the sole cause of the accident which claimed the life of Brian Davis, and that the United States of America, as his employer, is 100% liable for damages for damages arising out of the wrongful death of Brian Davis.

The court finds that Brian Davis was not negligent in the operation of his motor vehicle in any degree and therefore assigns no comparative fault to plaintiff's decedent.

## II. Conclusions of Law

Under the Federal Tort Claims Act (FTCA), the United States is liable for tortious conduct "in the same manner and to the same extent as a private individual under like circumstances" after applying the applicable law in the same jurisdiction. *Turner ex rel Turner v United States*, 514 F.3d 1194 (11th Cir. 2008), quoting 28 U.S.C. § 2674.

The law of the state where the wrongful death occurred dictates the components and measure of damages in FTCA claims. *Bravo v United States*, 532 F.3d 1154, 1160-61 (11th Cir. 2008), *opinion adhered to and extended*, 577 F.3d 1324 (11th Cir. 2009); *Johnson v United States,* 780 F.2d 902 (11th Cir. 1986).

Under Florida's Wrongful Death Act, Fla. Stat. §§ 768.21(1) and (4), the parents of a deceased minor child may recover for lost support and services and for mental pain and suffering. In this case, the Estate of Brian Davis brings claim solely for the mental pain and suffering of the

17

decedent's biological father and only statutory survivor, Philip Davis. This calculation of intangible loss is measured based on the life expectancy of the surviving parent, not the life expectancy of the minor child. *McQueen v Jersani*, 909 So.2d 491 (Fla. 5th DCA 2005).

In this case, mortality tables admitted into evidence show that the life expectancy of the surviving parent, Philip Davis, currently aged 50, to be 29.7 years. However, mortality tables are but one of the many factors that may be considered in estimating life expectancy. In deciding the amount of damages, the court is permitted to assess life expectancy based upon testimony at trial regarding the claimant's general health, physical condition, lifestyle and activities. *McQueen v Jersani*, 909 So.2d 491, 496 n. 3 (Fla. 5th DCA 2005).

In cases where mental pain and suffering are allowed, the award must bear some reasonable relation to the facts, the status of the parties, the amount allowed for compensatory damages, as well as the philosophy and general trend of decisions in similar cases. *See Bravo*, 532 F.3d at 1162; *Johnson v United States*, 780 F.2d 902, 907-08 (11th Cir. 1986), citing *Florida Dairies Co. v Rogers*, 119 Fla. 451, 161 So. 85, 88 (Fla. 1935). In reviewing the general trend of decisions in similar cases, the court should generally limit its inquiry to cases where pain and suffering awards were upheld against excessiveness challenges in similar scenarios, with a particular focus on cases drawn from the state appellate court having jurisdiction over the location where the tort in question occurred.

In determining an award of non-economic damages under Florida's wrongful death law, evidence of domestic discord between the decedent and the survivor is probative of the extent of the survivors' mental pain and suffering and their loss of the decedent's companionship and society. *See e.g. Adkins v Seaboard Coastline R.R. Co.*, 351 So.2d 1088 (Fla. 2d DCA 1977)(decedent's alleged paramour's testimony that decedent promised shortly before death to divorce his wife and marry

18

paramour was probative of extent of survivor's mental pain and suffering and loss of decedent's companionship and protection);[8] *Hiatt v United States*, 910 F.2d 737 (11th Cir. 1990)(upholding award of $100,000 in non-economic damages to surviving wife where record indicated that wife suspected her husband of infidelities and couple informally separated for a period of time).

Similarly, in assessing pain and suffering of the surviving parent over loss of a child-decedent, the level of support and care extended during the lifetime of the child is relevant to the equation. *See e.g. Collins v Florida Towing Corp.*, 262 So.2d 459 (Fla. 1st DCA 1972)(upholding $512 compensatory damage award for funeral costs for wrongful death of minor son where father left family for abode and companionship of another woman some time prior to accident); *Woods v Estate of Woods*, 770 So.2d 1270 (Fla. 3d DCA 2000)(in contest over distribution of sums for mental pain and suffering following settlement of wrongful death action on behalf of minor child, evidence sufficient to sustain 100% award to mother, as child's sole care giver, where evidence showed father had little or no contact with child during lifetime, and provided minimal or no support).

### III.  The Damage Award

*Bravo* suggests that the determination of non-economic damages in FTCA cases begin with a review of damage awards in similar cases originating in the jurisdiction where the tort occurred,

---

[8]As the Second District Court of Appeals explained in *Adkins, supra*:

> A contrary ruling would authorize the perpetration of fraud upon the jury ....We cannot allow the wrongful death claimant to paint rosy picture of the marital relationship while the defendants' hands are bound, preventing rebuttal.  A jury should not be misled to believe that a marriage at or past its breaking point was as zealous as a honeymoon merely because the marriage partners had not sought legal dissolution prior to the decedent's death.

351 So.2d at 1093.

with the inquiry limited to cases involving appellate  review of damage awards challenged as excessive.

One of the difficulties posed by this inquiry here is that only "similar" cases may be considered  in  determining an appropriate award, and it is difficult to find factually comparable  or "similar" Florida cases involving family discord and estrangement of the unique nature presented in this case, where the sole survivor's long history of alcohol and drug  abuse largely eclipsed any meaningful involvement  in the day-to-day life of his noble son.[9]  Recognizing this limitation in the case law, the court finds sufficient evidence in the record to render a reasonable and equitable determination on pain and suffering damages sustained by the decedent's surviving father.

Both parties in this case have tried the damage issue on the same premise: The nature of the father's relationship  with his son  offers  a  reliable  means  to  measure  the  pain  and  suffering experienced by the father upon the son's tragic death.  The plaintiff approached this issue by offering proof of a strong enduring relationship in the context of a warm, connected family group.  At the same time, plaintiff contended that a father who suffers from  alcoholism should not be precluded from

---

[9]

The court invited  the parties to present comparable Florida case examples to assist in its inquiry on this point. The plaintiff submitted a memorandum urging the court to consider as comparator cases two opinions issued by the Florida Fourth District Court of Appeal, the state appellate court having jurisdiction over Palm Beach County, the place where the accident occurred.
  In *Hyundai Motor Co. v Ferayorni*, 842 So.2d 905 (Fla. 4th DCA 2003), the  upheld awards of $3.1 and $3.8 million each for pain and suffering to the parents of a 17-year-old girl killed in an automobile accident as a result of a defective seat belt design.  In *Kammer v Hurley*, 765 So.2d 975 (Fla. 4th DCA 2000),  the court held that $2.5 million to each parent of a stillborn child for  mental pain and anguish was not excessive in light of the horrible way in which their full term, unborn child was killed moments before delivery.
  However, neither case involved parent-child  relationships strained  by long periods of financial non-support, formal relinquishment of parental authority, and chronic domestic violence, and thus offer no practical utility here as "similar" comparator cases which might assist the court in formulating a damage award for Philip Davis.

recovering damages for the loss of his son because alcoholism is a disease and he has not intentionally created the familial dysfunction fueled by his alcoholism.  The defendant's proof, on the other hand, depicted the father as a deeply troubled person, consumed by a long standing addiction to alcohol, who effectively abandoned his son to the care of an aunt.  Further, the defendant's proofs showed plaintiff's alcoholism manifesting in violent, disruptive behaviors  necessitating multiple police interventions, all of which  had a  profoundly disturbing and negative impact on the filial bonds which normally attend a parent-child relationship.

Thus,  both sides have focused on the relationship that existed between father and son as the guidepost for the court's measurement of damages. The court accepts this approach, and finds plaintiff's chronic alcoholism --along with the gross family dysfunction and interpersonal detachment which it generated –to be  highly relevant to the court's assessment of the emotional pain and suffering sustained by Mr. Davis in consequence of the death of his son.

With this premise, the court finds the record  replete with evidence which belies the contrived theme of plaintiff's case, i.e., that Philip Davis' alcoholism only served to intensify the close bond he enjoyed with his son by "bringing the family together in crisis." Aunt Carrie testified that it was Philip Davis, "drunk as usual," who bragged about drowning the children's pet pug when they were 7 and 10 years old, and that  it was the drunken rages of Philip Davis which led a  teenaged  Brian to take to sleeping in his car.  Katie Pelligrino, in turn, testified that Brian was deeply embarrassed by his father's behavior, and was running a "countdown" to graduation day when he could escape the Davis household and "never come back."

In reality, Philip Davis had no interest in raising his sons under his own roof until  the  SSA discovered  that Mr. Davis  was usurping the boys' death benefits for his own personal use.  Philip

had been living at his Celery Street abode roughly 1.5 years by the time he recalled the boys, and had made no movement toward revisiting the boys' custodial arrangements until his receipt of the boys' death benefits came into jeopardy, at that juncture insensitively cramming them  into a single bedroom to share with Winifred Pearl's two teenage girls in order to  avoid the forfeiture.

While no one would suggest that a father-son relationship burdened by an alcohol addiction is, in and of itself, a less than perfect form of love which mitigates against the value of the loss precipitated by  the death of child, where, as here, it is accompanied by a formal transfer of all parental control and responsibility  over the child to another by voluntary contract,  and a willful failure to financially support the child during  a significant term of the child's  minority– in this case marked by  a misappropriation  of  $27,000 in social security benefits  intended for the children's benefit  – these deliberate acts, unrelated to any alcohol issues,   necessarily negate the strength and quality of the affection and filial bond which the father professed to enjoy with his son.

Thus, while acknowledging  the enormity of the community's loss precipitated by the death of the remarkable Brian Davis, the court's measurement of the  father's loss in this case is one necessarily tempered by the father's detachment and lack of meaningful support of his son  during his brief lifetime.

Upon this background,  the court determines, as a result of the death of Brian Davis, Philip Davis, as   father and  sole statutory survivor of Brain Davis, has suffered the loss of society and companionship of his  son in the total  amount of three hundred thousand dollars ($300,000.00).

22

## IV. Decretal Provisions

Based on the foregoing, it is **ORDERED and ADJUDGED**:

1. Plaintiff, Philip Davis, as Personal Representative of The Estate of Brian Davis, deceased, shall recover from the defendant, United States of America, the total sum of three hundred thousand dollars ($300,000.00) for the benefit of the decedent's sole surviving parent, Philip Davis.

2. Post judgment interest shall be awarded pursuant to 28 U.S.C. §1961, subject to the limitations of 31 U.S.C. § 1304(b), and shall not accrue until such time as the judgment is filed with the Secretary of the Treasury. *Dickerson ex rel. Dickerson v United States*, 280 F.3d 470 (5th Cir. 2002); *Starns v United States*, 923 F.2d 34 (4th Cir.), *cert. den*. 502 U.S. 809 (1991).

3. The court reserves jurisdiction to determine the amount of taxable costs in favor of the plaintiff.

**DONE AND ORDERED** in Chambers at West Palm Beach, Florida this 10th day of June, 2010.

_____
Daniel T. K. Hurley
United States District Judge

cc. All counsel